GORMAN *v.* PATRICK HIRSCH CO.

1. Appeal and Error—Equity—Parties—Railroads.

In equitable proceedings by creditors of a railroad corporation for receivership, sale of the corporate property and distribution of the proceeds, after a sale under order of the court, the defendant railroad company had no interest in the proceeds, and its solicitor, having in writing consented as counsel of the receivers to the entry of the decree of distribution, making no objection to it in behalf of defendant, the latter could not appeal. Ostrander and McAlvay, JJ., dissenting.

2. Same.

The allowance of solicitors' and receivers' fees by the trial court was discretionary and will not be reversed on appeal unless the discretion was abused.

3. Same—Saving Questions for Review.

Objections not brought to the attention of the lower court will not be considered.

Appeal from Monroe; Lockwood, J. Submitted November 7, 1911. (Docket No. 61.) Decided December 17, 1912. Rehearing denied November 5, 1913.

Bill by Frank Gorman and others against the Patrick Hirsch Company, the Toledo, Ann Arbor & Detroit Railroad Company and others for the enforcement of mechanics' liens and other equitable relief. On petition of James L. Hosler and other creditors for distribution of funds derived from a sale under the order of the court a decree of distribution was entered. Defendant railroad company, certain intervening creditors and complainants appeal. Affirmed.

*Ralph S. Holbrook, Claude R. Banker,* and *Smith, Baldwin & Alexander,* for complainants.

*E. R. Gilday,* for defendant Toledo, Ann Arbor & Detroit Railroad Co.

MOORE, C. J. The record in this case covers 400 printed pages. The case is elaborately briefed. We think the following statement of facts, taken chiefly from the brief of the solicitors for the complainants, is justified by the record. We quote:

"This statement is largely taken from the opinion of Judge Lockwood. Prior to April 16, 1904, the Toledo & Northwestern Railway Company had been incorporated under the laws of the State of Ohio to construct and operate a railroad from the city of Toledo to the State line between the States of Ohio and Michigan, and the Michigan Traction Company had been organized under the laws of the State of Michigan to construct and operate a railroad from the State line between the States of Ohio and Michigan to the city of Ann Arbor. Some work had been done in preliminary surveys and in acquiring rights of way between these two cities.

"On the 16th day of April, 1904, a contract was entered into between the Toledo & Northwestern Railway Company and Patrick Hirsch wherein it was provided that the two railway companies above mentioned should be consolidated in a corporation to be known as the Toledo, Ann Arbor & Detroit Railway Company, which consolidated company should have

a capital stock of $1,500,000, and should issue bonds to the amount of $1,500,000, secured by a first mortgage on its property; that this contract should be assumed by the consolidated company, and Patrick Hirsch agreed in said contract to construct and complete a railroad from the city of Toledo in the State of Ohio to the city of Ann Arbor in the State of Michigan for said consolidated company, to equip the railroad with all necessary power houses, electrical machinery, substations, passenger and freight depots, and to do everything to make a complete railroad, for the sum of $2,765,000, to be paid with the stock of the consolidated company to the extent of $1,490,000 par value and $1,500,000 of its first mortgage bonds at 85 per cent., the same being the entire stock and bond issue of the consolidated company except 10 shares of the capital stock.

"This contract provided that, immediately upon the execution of the mortgage by the consolidated company, the trustee therein should deliver to Patrick Hirsch $240,000 face value of the bonds and contemporaneously $690,000 par value of the capital stock of the company, which were to be received by the contractor as part payment of the contract price, and the balance of the bonds and stocks, it was provided, should immediately be delivered to John H. Clauss, as trustee. It was further provided that, upon the commencement of the work by the contractor, Clauss, as trustee, should deliver to him $210,000 of the bonds and $133,000 par value of the said stock, and that each 30 days thereafter the trustee should, upon the receipt of a certificate of an engineer of the consolidated company, deliver $85,000 face value of the bonds and $50,000 par value of the stock, and upon the completion of the work should deliver the balance of the stocks and bonds to the contractor. And it was further provided that said Clauss was fully empowered, in his discretion, to hypothecate all of the bonds and stock held by him in escrow, as he might deem it wise, as collateral security for the notes of the contractor or for the payment of loans evidenced by such notes. It provided that the contractor should pay for all incidental expenses, legal counsel, engineering, and every other expense connected with the building and completing and equipping of said

railroad. This contract was, on the 26th day of May, 1904, assigned by Patrick Hirsch to Patrick Hirsch Company, a corporation, in consideration of the issuing to him of all of its common stock.

"The consolidated company, known as the Toledo, Ann Arbor & Detroit Railroad Company, was organized as provided in the contract, and Patrick Hirsch Company, a corporation under the laws of the State of Delaware, was also organized.

"The persons who were promoting this railroad, and who became stockholders of the consolidated company, were also stockholders and officers of the Patrick Hirsch Company. Mr. Clauss, who by this contract is made trustee of the bonds and stocks of the consolidated company, became president of the Toledo, Ann Arbor & Detroit Railroad Company and treasurer of the Patrick Hirsch Company. Many of the directors of the railroad company were directors of the Patrick Hirsch Company; in fact, there were no shares of stock in the railroad company except 10 that were originally subscribed for except the subscription was made through the intermediary, Patrick Hirsch Company.

"In this original contract for the construction of the road, mention is frequently made of Lawrence Barnum & Co. The trustee in the mortgage is to be satisfactory to Lawrence Barnum & Co.; the form and terms of the stock and bonds is also to be satisfactory to Lawrence Barnum & Co.; the first of $240,000 of the bonds and $690,000 of the stock are to be delivered upon the order of the consolidated company in such form as shall be approved by counsel for Lawrence Barnum & Co. Pursuant to this contract, the Toledo, Ann Arbor & Detroit Railroad Company on July 1, 1904, made and executed 1,500 bonds of the denomination of $1,000 each, and a mortgage upon all its property and all the property to be acquired thereafter by it to secure the payment of said bonds, said mortgage running to the Trust Company of America, as trustee, and all of these bonds and all but 10 shares of the stock of the railroad company were placed in the hands of J. H. Clauss.

"As a further preliminary, Patrick Hirsch Com-

pany entered into two contracts with Lawrence Barnum & Co. These contracts were simultaneously made and are dated June 1, 1904. One of these contracts, marked Exhibit No. 2, is an agreement on the part of Lawrence Barnum & Co. to purchase 1,113 of the bonds of the Toledo, Ann Arbor & Detroit Railroad Company at 85 cents on a dollar at any time within 90 days after the completion of the railroad in accordance with the plans and specifications, and also providing that the road shall be fully completed within two years from the date of the contract. The other of these contracts, marked Exhibit No. 3, in addition to the discount of 15 per cent. on the face of the bonds provides for the payment of $13,912.50 in cash to Lawrence Barnum & Co. each 90 days from the date of the contract to the completion of the road, and also payment of $40,000 in cash and $147,000 of the bonds and $100,000 of the stock of the railroad company; in other words, Lawrence Barnum & Co. was to receive, in addition to $100,000 of the stock, compensation and discount upon the bonds amounting to $443,200 on the basis that the construction would continue two years. The first of these contracts was shown to the various persons desiring to make subcontracts, but the second was not disclosed. The amount of money actually paid to Lawrence Barnum & Co. on account of this underwriting agreement was $90,426.62. As a further preliminary step, a so-called unit agreement, Exhibit 10, was made, wherein the organization of these railroad companies was recited, and the proposed consolidation and the issuance of the bonds and making of the mortgage was also recited, and it was further recited that John H. Clauss is in a position to acquire $240,000 of the first mortgage bonds to be issued by the said consolidated company when and as soon as the same are issued for the sum of $204,000 in cash. It was agreed between the subscribers to said agreement that the said bonds and stocks should be divided into 20 blocks or units, each to consist of $12,000 of said bonds and $34,500 of said capital stock, and that the subscription price of each of said blocks or units of bonds and stocks should be the sum of $10,200 in cash to be paid to said Clauss when called for under the terms of the agreement. The subscribers to this

agreement subscribed for most all of said units, and it appears from the testimony in this case that these subscribers, each of them, paid $10,200 for each unit, and received the bonds and stocks as above provided. These bonds and stocks were to be turned over to Patrick Hirsch immediately upon the execution of said mortgage by the terms of his contract with the railroad company. The money received upon this unit agreement went into the hands of Patrick Hirsch Company.

"Patrick Hirsch Company then sublet the construction of this railroad to various parties and made contracts with other parties for material to be used in the construction, among which contracts was a contract with Gorman Bros., the original complainants in this cause, for the construction of the power house at the village of Petersburg; and another with the Lamb Wire Fence Company for constructing fences along the right of way of the railroad; and another with J. L. Hosler & Co. for ties and materials to be used in said railroad. In all these contracts it was provided that Patrick Hirsch Company should pay 50 per cent. or thereabouts in cash and give its notes, secured by the first mortgage bonds of the consolidated company, for the other 50 per cent.

"The right of way was acquired by Mr. Burgoon, employed by the Hirsch Company, and title taken to the Toledo, Ann Arbor & Detroit Railroad Company. Nearly all of it was acquired between the city of Toledo and the city of Ann Arbor. The grading was largely done between these two points. Ties and rails were laid from Petersburg south a distance of about 18 miles and extending about 2½ miles into the State of Ohio. The various subcontractors and materialmen had accumulated large quantities of material along the line of the road, more especially at the village of Petersburg, for the construction of the railroad. Most of the actual work of construction was done between the 1st of June and the 1st of December, 1905. At this latter date, all work and furnishing of materials ceased because of the failure of Patrick Hirsch Company to make payments according to its contracts with the various parties.

"Later receivers were appointed in this case for the Toledo, Ann Arbor & Detroit Railroad Company

in the State of Michigan, and the same persons were appointed, by the court in Ohio, receivers of the railroad company in the State of Ohio, and a receiver was appointed, by the court in Ohio, for Patrick Hirsch Company.

"After the suspension of work, a number of suits were brought by the subcontractors and materialmen against Patrick Hirsch Company; several of them in replevin for material on the ground and some of it in the track, others in attachment, until finally the bill by Gorman Bros. was filed and all parties, including the railroad company, claiming any right to or liens upon the railroad property, or the materials that had been used in the making of the track so far as it was constructed, were before the court in this case.

"On August 24, 1906, the original bill of complaint in this cause was filed by Frank Gorman, James Gorman, and Thomas Gorman, comprising the copartnership of Gorman Bros., against Patrick Hirsch Company, the Toledo, Ann Arbor & Detroit Railroad Company, and the Trust Company of America. The purpose of the original bill was for the appointment of a receiver for the railroad company and to enforce a mechanic's lien against certain property in the village of Petersburg upon which the complainants had built and partially completed a power house under their contract with the Patrick Hirsch Company, which latter company had a contract with the Toledo, Ann Arbor & Detroit Railroad Company to construct the railroad from Toledo to Ann Arbor.

"The Trust Company of America filed its answer and a cross-bill in said cause, in which cross-bill the said Trust Company asked to have foreclosed the mortgage given by the Toledo, Ann Arbor & Detroit Railroad Company to it as trustee, covering all of the property of said railroad company to secure the bonds of said railroad company to the amount of $1,500,000. And in said cross-bill there were made defendants, in addition to the persons already made parties, the Lamb Wire Fence Company, the Fidelity Construction Company, and others.

"On March 19, 1907, the answer of the Toledo, Ann Arbor & Detroit Railroad Company and of Willis Baldwin and I. H. Burgoon, who had theretofore

been appointed receivers of said railroad company, to the original bill of complaint was filed. The default of Patrick Hirsch Company for want of appearance was entered by the complainants. On November 29, 1907, the Fidelity Construction Company filed its answer to the cross-bill of the Trust Company. On December 7, 1907, James L. Hosler & Co. filed its answer to the cross-bill of the Trust Company, in the nature of a cross-bill, asking that it be given a lien upon the railroad materials furnished by it under a contract with Patrick Hirsch Company and used in the construction of the railroad. On December 14, 1907, the Lamb Wire Fence Company filed its answer in the nature of a cross-bill to the cross-bill of the Trust Company, and asked that it be given a lien on certain property which it had attached in a suit against Patrick Hirsch Company prior to the lien of the mortgage of the Trust Company of America. To the answers and cross-bills of the Toledo, Ann Arbor & Detroit Railroad Company and its receivers and of the Lamb Wire Fence Company and of James L. Hosler & Co., the Trust Company of America filed separate answers. The default of Patrick Hirsch Company, for want of appearance and answer to the cross-bill of the Trust Company, was entered by the Trust Company of America.

"On these several issues a hearing was had before Judge Lockwood, and on July 1, 1908, a final decree was entered finding that complainants, Gorman Bros., and the defendants, the Lamb Wire Fence Company and James L. Hosler and Robert C. Bowlus, had no lien against the property in question; that the mortgage given by the railroad company to the Trust Company of America was a good and valid mortgage and a first lien on all the property of the railroad company, and ordered a sale of the railroad and a distribution of the fund realized to the several bondholders as found in the decree, with the following provisions as to the unit holders. The court further finds that 145 of the remaining bonds secured by the said mortgage aforesaid are valid obligations of said railroad company, and were, at the time of the hearing of this cause, held by the parties set forth in the following schedule to the amounts and of the number set forth opposite their respective names, to wit:

Schedule B.

| Name. | Nos. of Bonds. | | | Total. |
|---|---|---|---|---|
| J. B. Foraker................. | 1 to | 12 | inclusive | 12 |
| J. M. Griffith.................. | 13 | | | 1 |
| Mary S. Bacon................ | 14 to | 24 | " | 11 |
| J. W. Pero & Co.............. | 25 to | 36 | " | 12 |
| Chas. Thompson ............. | 37 to | 48 | " | 12 |
| M. I. Wilcox Est.............. | 49 to | 68 | " | 20 |
| W. A. Jones.................. | 69 to | 80 | " | 12 |
| W. M. Holliday............... | 81 to | 83 | " | 3 |
| O. S. Wilcox.................. | 84 to | 89 | " | 6 |
| H. E. Rouse.................. | 90 to | 95 | " | 6 |
| M. I. Wilcox Est.............. | 96 to | 99 | " | 4 |
| H. C. Stahl...................100 | to | 111 | " | 12 |
| J. H. Clauss..................377 | to | 387 | " | 11 |
| J. H. Clauss..................148 | to | 159 | ' " | 12 |
| J. H. Clauss..................136 | | | | 1 |
| M. C. Briggs Est.............137 | to | 146 | " | 10 |
| Total | | | | 145 |

"With reference to all these bonds enumerated in Schedule B and secured by said parties under the so-called unit agreement, the court finds they are outstanding obligations of the Toledo, Ann Arbor & Detroit Railroad Company to the amount of their face, together with the accumulated interest. The court further finds that it is claimed by several of the parties of this cause that all of the 145 bonds enumerated in Schedule B were issued to the parties by which the same are held as hereinbefore set forth under the agreement by which said parties or some of them became the owners of a large amount of the capital stock of the said railroad company, for which said parties paid no value, and that the parties so receiving the said bonds are liable to said company and its creditors for the unpaid value of said stock. The court does not at this time determine the question as to the liability of the holders of said last-named bonds as for unpaid stock subscription, but it orders that the amount to which the holders of said 145 bonds would be entitled to receive out of the proceeds of sale of said property to be paid to the register of the court to abide the further order of the court herein on application of either of the holders of said bonds or of the receivers of said railroad company.'

"The railroad having been sold, there was paid to the register of this court November 1, 1909, the sum of $5,060.64, being the amount due to the aforesaid unit holders. The court then made an order July 12, 1909, upon the petition of the receivers, directing a notice to be published requiring all creditors of the railroad company to exhibit their claims and become parties to this suit, as provided by statute, on or before February 1, 1910. In accordance with said order, the Lamb Wire Fence Company, Gorman Bros., and J. L. Hosler and no others filed their intervening petitions, setting up claims amounting to $7,838.88 and $18,628.25 and $————, respectively, growing out of their contracts made with the Patrick Hirsch Company as subcontractors in the building of the Toledo, Ann Arbor & Detroit Railroad. The following also filed claims with the register, but not intervening petitions, claiming to be direct creditors of the railroad company: Jno. O. Zabel, $3,311.32; John White, $241.62; C. H. Masters, $500.00.

"The petitions are too lengthy to quote here. They set forth the facts showing the manner of the organization of the railroad company and the Patrick Hirsch Company, the way the road was attempted to be built, and the method pursued in the issuing of the stocks and bonds of the railroad company; alleging among other things the following: The whole purpose and design of the promoters of the railroad company, being the persons above mentioned and their associates, if any, in all the incorporations, contracts, resolutions and acts aforesaid, or done in connection therewith, was and is: *(a)* To enable said railroad company to issue to said promoters above named the bonds and stocks of the said railroad company at less than their par value, and that the aggregate of said bonds and stocks should be more than twice the actual value of the railroad for which they were ostensibly issued. *(b)* That by the fiction of a contract for the construction of said railroad with another company it might be made to appear that said bonds and stocks were issued for actual value, and thus enable the promoters to receive said bonds and stocks and place them on the market for sale to innocent purchasers at a discount, who could not buy directly from the railroad company at less than par.

*(c)* To enable the construction company to make sub-contracts with labor and materialmen for the actual construction of said railroad, such as Gorman Bros., but whose claims and demands for payment would be against the construction company and not against the railroad, which latter would have the railroad protected by the lien of the trust deed securing the bonds, and said bonds being payable to bearer, either held by said individuals interested or some one of them, or sold on the market and the proceeds thus received and held for their individual benefits.

"The prayer is as follows: *(a)* That upon the hearing of this petition the said court may make an order declaring the contract made by your petitioners with the said Patrick Hirsch Company for the construction of the said power house as aforesaid to be a contract made with both corporations, and with the officers and directors of said corporations. *(b)* That upon the hearing of said petition, the said court may make an order that said contract was made with the Toledo, Ann Arbor & Detroit Railroad Company, as well as with the Patrick Hirsch Company. *(c)* That the court may, upon the hearing thereof, declare that in equity the said fund should be subject and applied upon the claim of your petitioners.

"On April 5, 1910, the receivers of the railroad company filed a petition to determine the distribution of the money, amounting to $5,060.64, in the hands of the register, alleging among other things: Your petitioners further represent that they are informed and believe that the holders of said 145 bonds, excepting the said Mary S. Bacon, are indebted to the said railroad company largely in excess of said sum now in the hands of said register (and each of them are so indebted), and certain creditors of the said defendant the Toledo, Ann Arbor & Detroit Railroad Company claimed that all of the holders of said 145 bonds, on account of fraudulent acts of said holders in their connection with the organization and management of the said railroad company and the Patrick Hirsch Construction Company, and because of their purchase of the stock of said railroad company, which they severally have not paid for, and which they are severally owing the said railroad company therefor, are liable to the said railroad company and its cred-

itors as and for unpaid stock subscriptions; and your petitioners aver, upon information and belief, upon the grounds above stated, that all of the said above-named bondholders, except the said Mary S. Bacon, are owing to the said railroad company for unpaid stock as aforesaid for the par value of $33,500 of stock for each 12 bonds held by each of the above-named parties, and that each one of said above-named persons, excepting the said Mary S. Bacon, is owing to the said railroad company the sum of $2,791.66 for each bond so held by him respectively.

"The prayer of the petition was as follows: (1) That the court declare all of said funds in the hands of the register of this court, excepting that proportionable to said Mary S. Bacon, be declared a payment on the indebtedness of the aforesaid parties to the said railroad company, and that the same be paid to the receivers of said company. (2) That, in so far as the holder of said bonds appear in this court, this court determine the amount due to the said railroad company from the said holders of bonds respectively, and order such amounts so found to be due to be paid to the receivers of said railroad company.

"Notice to the unit holders, most of them being nonresident, was given by publication, and, none of them appearing, a default was taken against all of them except Mary S. Bacon, who filed an answer admitting that she was the owner of 11 bonds, but denying that she was a unit holder. To the intervening petitions of the fence company and Gorman Bros., an answer in the way of a general denial was filed by the railroad company and its receivers. The case having been heard before Judge Golden on December 16, 1910, a decree was entered finding in favor of the intervening creditors and Mary S. Bacon, and ordering the receivers to distribute the fund and pay the same out as follows: (1) To Mary S. Bacon her pro rata share on 11 bonds. (2) That he pay the costs and expenses of the receivers and their attorneys as follows: John O. Zabel, $500; Willis Baldwin, $500; I. H. Burgoon, receiver, $60; Edward J. Ready, register, $———. (3) What shall remain in the hands of the court shall be distributed as follows: Pro rata between the said Gorman Bros., Lamb Wire Fence Company, Willis Baldwin, John O. Zabel, J. S.

Clark, Fred Froehlich, I. H. Burgoon, John White, and Chas. Masters.

"From this decree the railroad company has appealed, and the Lamb Wire Fence Company and Gorman Bros. made a cross-appeal from so much of the decree as provided for distribution to others than themselves."

The first important question to be determined is whether the railroad company has a right to appeal this case. We quote from the brief of counsel for the railroad company:

"Whether or not the railroad company had any right to the so-called fund is neither here nor there; the point is that the appellees, as a foundation for reaching the fund, had to have a decree establishing their claims (which on their face were against another person) as claims against the railroad company. This they have obtained, and they have obtained it by a decree; and, if the railroad company has enough life to obtain a decree against it, then it has enough life to defend itself by an appeal. A corporation is not dead simply because a receiver has been appointed over its property. *State* v. *Merchant*, 37 Ohio St. 251."

This sounds well, but it is not conclusive. At this point it becomes important to know the status of the case when the decree was entered. The answers to the intervening petitions after the formal part commenced as follows:

"The answer of the defendant the Toledo, Ann Arbor & Detroit Railroad Company, and Willis Baldwin and Isadore H. Burgoon, receivers of said defendant, heretofore appointed in said cause by this court, to the intervening petition of James H. Hosler and Robert A. Bollus, filed herein. These defendants and respondents hereby reserving to themselves all right of exception to the said intervening petition for answer thereto say:  *   *   *"

It ended as follows:

"And deny that petitioners are entitled to the re-

lief prayed for or any part thereof, and ask to be dismissed with their reasonable costs in this behalf expended.

"The Toledo, Ann Arbor & Detroit
Railroad Company,
"By JOHN O. ZABEL, Secretary.
"Willis Baldwin and Isadore Burgoon, Receivers and Respondents,
"By JOHN O. ZABEL, Their Attorney.
[Seal.]
"JOHN O. ZABEL,
"Solicitor for Defendants and Respondents."

It will be observed that these signatures are all made by Mr. Zabel. It has already appeared that as early as July, 1908, it was decreed that the amount of the—

'Proceeds of the sale of the property, should be paid to the register of the court to abide the further order of the court on application of either of the holders of said bonds or of the receivers of said railroad company."

It has also appeared that in April, 1910, the receivers petitioned for a distribution of the fund. In that petition a reference was made to the creditors and the amount of their claims, and the following appears: "Your petitioners further show that there are no funds to pay the claims of the said company excepting the sum of $5,060.64 and such sum as may be realized from such unpaid stock subscriptions"— showing clearly that the railroad company was insolvent. It also appears that after a hearing, and in December, 1910, a decree was entered which, after the formal part, reads in part as follows:

"This cause came on to be heard upon a petition of Willis Baldwin and Isadore H. Burgoon, receivers of the Toledo, Ann Arbor & Detroit Railroad Company, heretofore appointed herein by this court, the answer of Mary S. Bacon thereto, and upon the intervening petitions of Frank Gorman and Thomas Gorman, survivors of the copartnership theretofore doing

business under the firm name and style of Gorman Bros., the intervening petition of the Lamb Wire Fence Company, a corporation, and the intervening petition of J. L. Hosler & Co., a copartnership, the answer thereto, the replication of said intervening petitioner to such answers, and the proofs taken in open court in said cause, and having been argued by counsel for the respective parties, and the court having duly considered the same, the court finds as follows."

Then follow the findings of the court, including costs and expenses to the receivers and their attorney. Indorsed on this decree is the following:

"I consent to the entry of the above decree.
                                "JOHN O. ZABEL,
                        "Attorney for Receivers."

It will be remembered that Mr. Zabel had appeared for all the defendants, and that they had no other solicitor of record. It is clear he had knowledge of the proposed decree, and that the railroad company, as a company, had no interest in the fund, and that it was hopelessly bankrupt. It does not appear that any objection was made to the entry of this decree by Mr. Zabel or by anybody else. Later Mr. Zabel ceased to be the solicitor for the railroad company, and another was substituted in his place by his consent, and this appeal was taken. The fact should not be overlooked that, though notice was given of the petition by publication, none of the unit holders appeared. It should also be remembered that, when this decree was made, the railroad company was in the hands of a receiver, and, so far as the record discloses, is still in the hands of a receiver. The court was not requested to direct the receiver to appeal from the decree. No request was made of the court, or granted, giving the railroad company permission to appeal the case.

The following proposition of law has been stated as to chancery appeals:

"An appeal can only be taken by parties who are affected by the decree appealed from; there must be some substantial rights of the parties to which the appeal would be prejudicial. An appeal will not be allowed in a mere fictitious case, and the court will not entertain mere speculations of parties or feigned issues; and so a merely fictitious case to test the rights of parties who do any particular thing will not be entertained by the appellate courts." Van Zile's Equity Pleading & Practice, § 360, p. 494.

See *Chapin* v. *Perrin,* 46 Mich. 130 (8 N. W. 721); *Owen* v. *Yale,* 75 Mich. 256 (42 N. W. 817); *Weber* v. *Costigan,* 139 Mich. 146 (102 N. W. 666).

In this case, under all the facts surrounding it, with the railroad company having no interest in the fund, to say that as to the receivers the decree was a consent decree from which they could not appeal, but as to the railroad company it was not a consent decree from which it could appeal, would be a refinement of words which does not appeal to our sense of justice. We think it must be held that as to the railroad company the appeal should be dismissed. This brings us to the cross-appeal. Objection is made to the allowance to Mary S. Bacon. We think the answer of Mrs. Bacon, the testimony of her husband, and the consent of the receiver justified this part of the decree.

Objection is made to the allowance for solicitor's and receiver's fees. The trial judge was familiar with the litigation which was very considerable, and there is nothing to indicate that he abused his discretion in making these allowances.

Objection is made to the allowance of certain claims, which it is said were not filed with the register. The record shows the attention of the court was called to these claims and proofs were taken in open court in relation thereto. We think the decree as to them should not be disturbed.

We again quote from the brief:

"If, however, the court should be of the opinion that they should participate, then we think the court should allow the solicitors of Gorman Bros. and the Lamb Wire Fence Company reasonable compensation for their services in prosecuting this case, to be charged against the fund. Otherwise Gorman Bros. and the Lamb Wire Fence Company, who were diligent and complied with the order of the court, must pay their solicitors in both the lower court and Supreme Court, and to that extent, be worse off than the other creditors, who were tardy and failed to comply with the court's order."

Our attention has not been called to any place in the record where the solicitors made this claim in the court below. No reference is made to this subject in the cross-appeal.

We find no reversible error, and the decree is affirmed. As both parties have appealed, no costs will be allowed.

STEERE, BROOKE, KUHN, and STONE, JJ., concurred with MOORE, C. J.

OSTRANDER, J. I think that no reason is given in this opinion for denying to the defendant railroad company the right to appeal. As a majority of the justices are of a different opinion, it is not necessary for me to examine other questions.

McALVAY, J., concurred with OSTRANDER, J.